Eoane, Judge.
This was an action brought by the appellant against the appellee, in the Hustings court of the borough of Norfolk. It was founded upon a policy of insurance. That policy was upon a vessel called the Two Brothers, bound from Norfolk to a port in the West Indies, and warranted to be “American property.” The vessel was captured and carried into the Island of Jamaica, libelled in the court of admiralty, there, and condemned as “enemy’s property.”
At the trial, the plaintiff offered testimony to prove, that the vessel was, in fact, American property; which testimony was objected to, on the ground that the decree of the court of admiralty was conclusive evidence *21 in this case, of the fact of her being enemy’s property, but the court overruled the objection, and permitted the evidence to go to the Jury; whereupon the defendant excepted. The counsel for the defendant also moved the court to instruct the Jury, that the vessel having been sold under the decree aforesaid, and the captain having purchased her for the benefit of the plaintiff*, to whom she was delivered by him, he was not entitled to recover as for a total loss, but only in proportion to the sum expended; but the court refused so to instruct the Jury, whereupon the defendant also excepted. A verdict was found for the plaintiff, and the defendant appealed to the former district court of Suffolk, where the judgment was reversed, and anew trial directed; that court being of opinion, that the sentence of the admiralty court was conclusive evidence to prove, that the vessel belonged to tne enemies of Great Britain. The parties agreed, in the last mentioned court, to release all other errors than those relied on in the bills of exceptions; and the plaintiff appealed from the judgment of reversal, aforesaid, to this court.
With respect to the point made by the second bill of exceptions, we are of opinion that when the vessel was captured, the case was consummated, by the offer to abandon, so as to entitle the party to go for a total loss; and that the case was not altered by the circumstance, that the vessel was, afterwards, bought in by a friend, or agent, of the assured.
The point made in the first bill of exceptions, requires more consideration, and is deemed by the court, to be extremely important.
It is a principle of general jurisprudence, formerly held sacred, even by Great Britain herself, that questions of prize between subjects or citizens of different nations, are to be governed, entirely, by the law of nations, in exclusion of the local or municipal laws of any country. *22 (m) It is another principle, that the courts of admiralty, of each country, acted within their respective spheres, for the great family of nations, in carrying into effect this j ust and general law. In this state of things each court was entitled to the confidence of the others, and no laws were acted upon or administered by any, hut such as were submitted to', and acknowledged, by all.
In this state of things, also, comity, reciprocity, and general convenience, sanctioned it as a general principle, that the decrees of each court should he respected by the others. That principle, however, as originally declared, and as, even now, understood, by some of the nations of Europe, only extended to the decree itself, and not to all the facts and questions, wheresoever arising, on which that decree may have been founded. The decree proceeded entirely in rem; and it was founded in general convenience, that the title of the purchaser, under it, should not be questioned. A contrary doctrine would tend to diminish the actual price for which the property might be sold, and thus, in the event of a restitution, or otherwise, throw an actual loss upon the owner of the property himself.
It is believed that no nation has refused to accede to this doctrine, to the extent which is now stated, on account of the convenience and utility aforesaid. How far the principle as thus limited and understood, may be shaken by a system of profligacy in the courts of any country, discarding every rule but that of their own will, or that of their particular sovereign, and violating the clearest principles of justice, may deserve consideration in future. In the case now before us, that enquiry need not be made.
This convenience, howrever, is not involved in a collateral controversy, which exhibits the same question, between two individuals in another country, touching *23 ihe construction of their contract, nor is this comity at all involved, in such a case. It is sufficient for the most punctilious sovereign, that its decrees have had their effect, and that titles derived under them, arc not attempted to be disturbed. Another nation may, even upon the same contract, draw a different conclusion, hy means of its courts, between two of its own citizens, without offending the dignity of the power which renders the decree.
This is, most emphatically, the case, when the admiralty court rendering the decree, has discarded the law of nations from its code, and only goes by the ex parle laws, or orders, of its particular sovereign. The case is, further, extremely aggravated, when these laws or orders have no other object, than the aggrandizement of the power which promulgates them; and when its courts lend their aid, to further the object aforesaid. In that case, they cease to ho judicial tribunals; or, at least, they cease to administer the law of nations. In that case, the court becomes, in fact, a belligerent instrument, and its judgments act only upon the local laws or orders of its sovereign; and all the cases concur in shewing, that a judgment rendered in another country, in a civil action, is not absolutely conclusive in this.
Such is the character of the British vice admiralty courts, and of their decisions, in modern times. These facts are not particularly found, in this record, but they are known to the court, judicially, as a matter of general history. They have been often admitted by the courts, as well as other departments, of our country; and are not denied by even the British jurists, themselves. We are to proceed then upon the assumption of these facts. We are to suppose that the condemnation in question, may have been founded upon the arbitrary orders of the English king in council, and upon the ideas of the right of blockade, which are acted upon by that nation. We are to suppose that the ground of the decree may have *24 been manifestly unjust and illegal. If, in tlie case of Mayne v. Walter,(m) it was held, even in England, that where the ground of decision appeared to be, a fore^n or(linance» manifestly unjust, and contrary to the laws of nations, the insurer should not be discharged, we ought, in this case, to retort her doctrine upon her. We can admit no difference between a fact brought into a case, by a particular finding, and one which is, indubitably, known to the court, as a matter of general history.
This view of the subject precludes the necessity of deciding, how far, under the former state of things, the decree would have been conclusive, in the case before us. It could not have been so conclusive, without violating the great principle, often sanctioned by this court, that no man is to be bound by a decree or judgment, as to which he had not the liberty to cross-examine. The insured, are only parties to the decree of the court of admiralty, as it were, by a fiction, and for the single purpose of effectuating, and protecting, the sale of the property. That fiction need not be extended both beyond the truth of the case, and beyond those purposes of utility, which it was intended to answer. We ought not to adopt, lightly and implicitly, the late decisions of the British courts, upon this subject, which seem to have grown up with the new state of things, before adverted to. We ought to recollect that Britain is an insuring, while we are an insured nation. We ought not to adopt the British decisions of the present day; but rather to mount up to the days of Hughes v. Cornelius. At that time the validity of the sale under the decree, was, only, in question; and all the general expressions in the judgment of the court, should be understood as restricted by it.
If the question now before the court, be a question of the common law, it ought to adapt itself to the varying circumstances of things, by which it is affected. A change as to it, may well have been produced, by the *25 nefarious conduct of some nations, in modern times. If it be a question of common law, we ought rather to re-for to that code, as it was understood, upon this subject, at the epoch of our separation from Britain. We ought rather to adopt that construction which conforms to the golden principle, that no man ought to be bound by a decision to which he was not, substantially, a party. We ought rather to go by the principle which prevails, in relation to the municipal judgments of foreign courts. We ought to consider this decree, as, in fact, such a judgment. It is founded, only, on the ex parte and particular regulations of the British nation.
If, on the contrary, this be a question under the law of nations, the Brilish courts are not the exclusive arbiters of it. On a question of national law, we refer to other, and more impartial, authorities. We consult the learned on that subject, and resort to the concurring testimony of general jurists. We act upon the unerring maxim, “potius est petere fontes.” It is not new for this court to differ from the courts of England, on questions of general law. It was done in the case of Reed and Reed, in favour of the great natural right of expatriation. In-that case we scouted the slavish doctrines to be found in the case of Calvin. If, therefore, Britain lias decided this question one way, France and other nations have- decided it in another; and we are to chuso between them. In making this decision, we are to go by great principles, and not by the conflicting and unsatisfactory decisions of British Judges.
It is a clear principle, peculiarly fitting the present times, that the unjust decisions of foreign courts, is one of the risks insured against: but this right would be cut up by the roots, if we are not permitted, (in this case between the parties to the policy,) to shew the decision to be unjust. That right is without a remedy, unless the decision is open to investigation, in this particular.
*26 Nor ought it to be forgotten, that, by holding the sentence to be conclusive, which sentence was not founded upon a jury-trial, we deprive our citizens of a resort *bat tribunal, which is consecrated by our bill of rights. We also deprive them of the inestimable privilege of resorting to viva voce testimony.
These are the general grounds, on which our opinion in this case is founded. They might be stated more at large; but it is deemed to be unnecessary. We have not quoted many decisions, on this subject; but few of the cases have escaped us. The modern decisions in England are, for the reasons aforesaid, discarded from our view. As for those in our own country, they are both ways; and some of them have regarded the English cases, more than great principles. We are to judge for ourselves, in this chaos of judgments, and we submit the result of our best deliberation. That result, while it does not infringe upon utility, comity, or convenience, in the smallest degree, is essential to justice between the parties. We only contend that a party shall have an opportunity to prove the truth of those facts, on which his claim to compensation is founded: and that he may have the benefit of his witnesses, here, whom he could neither summon, nor carry, into a foreign country.
This view of the case precludes the necessity of considering, how far the insertion of the words “or otherwise,” in this decree, would, in the event of a different decision, have deprived the same of its conclusive effect.
Our opinion, consequently, is, that the court of Hustings did not err, on either of the points stated in the bills of exceptions; and that the judgment of the district court reversing its judgment, is erroneous. That judgment, is, of course, to be reversed, and that of the court of Hustings affirmed.
Note. The Judges were unanimous in this opinion; except that Judge BrooÉe requested the presiding judge to say, that he dissented from so much thereof, as decided, that the decree in question was not conclusive,

 3 Black, Com. p. 69.

) 4 Bac. Ab’t, 670. Parke on Ins. p. 363.